UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-254 (ECT/LIB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL PATRICK BUSHEY,

Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENT AND NOTICE OF INTENT TO CALL WITNESS**

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Manda M. Sertich, Assistant United States Attorney, hereby submits its response to defendant Michael Patrick Bushey's Motion to Suppress Statement (Doc. No. 75) and its notice of intent to call a witness at the hearing on that motion.

**A. RESPONSE TO MOTION**.

Defendant moves the Court for an Order suppressing his statements made to law enforcement during the execution of a search warrant at his residence on January 27, 2016. Defendant argues that: (1) law enforcement conducted a custodial interview of Defendant without a *Miranda* warning; and (2) that Defendant's statements were not voluntary due to his mental health disabilities and law enforcement's "knowledge and manipulation of [Defendant's] diminished capacity." The Government will offer testimony at the evidentiary hearing from Special Agent Katie Booth from the Minnesota Bureau of Criminal Apprehension ("BCA") to establish the following facts, among others.

On January 27, 2016, approximately six law enforcement officers from the BCA executed a search warrant at Defendant's residence at approximately 12:30 p.m. At the time, Defendant resided in a living unit on the second floor of a building with several other individuals with a common kitchen and living room area. Defendant had his own bedroom within the unit.

The law enforcement officers were accompanied by Defendant's Probation Officer, Sam Papin. Before the interview, SA Booth recalls PO Papin told SA Booth that Defendant was on the autism spectrum and that he had a guardian. PO Papin entered the building first and located Defendant on the second floor. Law enforcement then entered the building and secured Defendant's room.

SA Booth spoke with Defendant in the hallway on the second floor of the residence and explained she had a search warrant for Defendant's apartment. She requested to speak with Defendant in the common living area of the residence, and Defendant agreed. Prior to sitting down to speak with Defendant, SA Booth removed Defendant's cellular phone from his pocket and transferred custody of it to another law enforcement officer.

SA Booth interviewed Defendant in the common area of the apartment while the other agents executed the search in Defendant's room, which was down a hallway away from the common area. On Defendant's request, PO Papin remained with Defendant during the interview. The interview was audio recorded.

At the outset of the interview, SA Booth told Defendant that law enforcement had a search warrant for his residence, and she provided him with a copy of the search warrant.

Defendant told SA Booth that he was vulnerable, had a guardian, and had Asperger syndrome. Defendant asked whether he could call his guardian. SA Booth told Defendant he could call his guardian, but Defendant chose not to do so.

SA Booth repeatedly advised Defendant that he was not under arrest and that she did not intend to remove him from the home. She repeatedly told Defendant it was his choice whether to speak with her and he was free to leave at any time during the conversation. Defendant chose to speak with SA Booth. Defendant indicated his belief that SA Booth was there to help him, and SA Booth repeatedly told Defendant she was not there to help him, she was there to investigate a crime. SA Booth interviewed Defendant for approximately one hour and twenty minutes, including a seven-minute break towards the middle of the interview when SA Booth left the room to confer with a colleague. During that break, Defendant spoke with PO Papin and got emotional.

Defendant told SA Booth he had graduated from high school and attended college for a period of time. Defendant admitted to possessing child pornography on his phone. He admitted to masturbating to child pornography, being sexually attracted to children, writing stories about adults being sexual with children, trading images with other people via email exchanges, and preferring images of girls that are between two and seventeen years of age.

All parties to the interview remained calm and cooperative throughout the interview; at times, Defendant called SA Booth "nice" and thanked her for being nice. At the conclusion of the interview, SA Booth reiterated that she had told him he was not under

arrest, nor did he have to speak with her. Defendant then stated he did not feel he could leave because he felt "pressure" based on the "authority" of the law enforcement officers, but agreed SA Booth had not made any promises to him. He then provided information as to where other child pornography may be found in his bedroom. SA Booth ended the interview.

SA Booth started a second audio recording shortly thereafter to clarify Defendant's previous statements about being able to end the interview. Defendant acknowledged that SA Booth had told him he was not under arrest. When SA Booth said she wanted to make sure Defendant understood he was not under arrest and did not need to speak with her, Defendant asked why she needed to "double check." He stated he did not see why she needed to "double check" and stated she did not have to do so. SA Booth told Defendant she wanted to make sure she was not intimidating Defendant. Defendant stated SA Booth did not intimidate her, and he apologized for making SA Booth worry. SA Booth stated she wanted to ensure she was clear that Defendant was talking on his own free will and that she made him no promises. Defendant indicated she had not made him any promises. SA Booth ended the second audio recording, which lasted approximately five minutes (the conversation summarized above lasted about two minutes, and then they talked for a few more minutes about Defendant's Xbox).

Defendant was not arrested at the conclusion of the interview; he was taken into custody on a later date. While Defendant was patted down to check for weapons when first encountered by law enforcement, he was not handcuffed at any time. He was not given a

*Miranda* warning.  His physical movement throughout the interview was not restricted.

The law enforcement officers were not wearing their uniforms and did not draw their

weapons at any point.  Other than one or two instances where an officer asked SA Booth

questions, only SA Booth and PO Papin were present in the common area of Defendant's

residence for the interview.

### 1. Defendant Was Not in Custody.

An individual is entitled to *Miranda* warnings only when he is interviewed by law

enforcement while "in custody," meaning there has been a "formal arrest or restraint on

freedom of movement of the degree associated with a formal arrest." *California v. Beheler*,

463 U.S. 1121, 1124-25 (1983).  "To determine whether a defendant was in custody for

*Miranda* purposes, a court looks to the totality of the circumstances confronting the

defendant at the time of the interview and asks whether a reasonable person in his position

would consider his freedom of movement restricted to the degree associated with formal

arrest." *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted).

Courts consider the following non-exclusive factors, often referred to as the *Griffin*[1]

factors, to inform the custody inquiry:

> (1) whether the suspect was informed at the time of
> questioning that the questioning was voluntary, that the
> suspect was free to leave or request the officers to do so, or that
> the suspect was not considered under arrest; (2) whether the
> suspect possessed freedom of movement during questioning;
> (3) whether the suspect initiated contact with authorities or
> voluntarily acquiesced to official requests to respond to
> questions; (4) whether strong arm tactics or deceptive

---

[1] *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011). The first three factors, if present, mitigate against the existence of custody, while the last three factors, if present, aggravate toward the existence of custody. *United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002). Although "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors," *Griffin*, 922 F.2d at 1349, no one factor is dispositive, *United States v. Willie*, 462 F.3d 892, 897 (8th Cir. 2006). In addition, this Court has cautioned that "[t]he debatable marginal presence of certain judicially-created factors that ostensibly tend to 'aggravate the existence of custody' cannot create the functional equivalent of formal arrest where the most important circumstances show its absence." *United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004). Simply put, "[t]he ultimate inquiry is . . . whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quotation omitted).

During his interview, Defendant was informed he was not under arrest and did not have to answer law enforcement's questions, possessed freedom to leave the interview, responded voluntarily to questions that were posed to him, did not encounter any "strong arm" tactics by law enforcement, was not lied to by law enforcement or otherwise deceived, and was not placed under arrest at the end of the interview.

Additionally, the Eighth Circuit has held that the atmosphere of an interview is not police dominated just because a search warrant is being executed during the time of the interview. In *United States v. Perrin*, 659 F.3d 718 (2011), law enforcement asked a defendant to speak to them in his bedroom during an execution of a search warrant at the defendant's residence. Noting that "[a]ny warrant search is inherently police dominated," the Eighth Circuit held there was "nothing untoward about that circumstance" where neither officer "prevented [the defendant] from exercising his right to leave—they did not physically restrain him, and nothing of record suggests that they positioned themselves or acted to inhibit [the defendant's] exit." *Id.* at 721 ("We have held that circumstances more dominated by police were not custodial."); *see also United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) ("Miranda applies only when the circumstances approximate a formal arrest, and execution of a search warrant is not an arrest"); *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) ("[T]he fifth indicium is whether the questioning, not the execution of the search warrant, was police dominated."); *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (atmosphere of questioning was not police dominated where two agents interviewed defendant while nine officers participated in the execution of a search warrant); *United States v. Upshaw*, No. 12-299 (MJD/LIB), 2013 WL 1104759, at *9 (D. Minn. Feb. 5, 2013) ("the fact that approximately eight other federal and local law enforcement officers were actively searching Defendant's home during the interview does not mean that the interview was police dominated"). Here, Defendant was interviewed in the common area of his residence by SA Booth, in the presence of his probation officer,

7

whose presence he requested.  The other handful of law enforcement officers involved in the execution of the search warrant were down the hall searching his bedroom at the time, and he was not prevented from leaving the interview; rather, he was repeatedly informed he could terminate the interview if he chose to do so.

Consequently, none of the *Griffin* factors weigh in favor of Defendant's argument that the interview was custodial, and Defendant was not entitled to a *Miranda* warning.

### 2.  Defendant's Statement Was Voluntary.

Whether a confession is the involuntary product of coercion is judged by the totality of the circumstances, including an examination of both the conduct of the officers and the characteristics of the accused.  *Rachlin v. United States*, 723 F.2d 1373, 1377 (8th Cir. 1983); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  "In determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth,* 412 U.S. at 226.  In a voluntariness analysis, "[r]elevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation." *United States v. Contreras*, 372 F.3d. 974, 976 (8th Cir. 2004) (quoting *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998)).

But, as noted above, police coercion is a necessary prerequisite to a determination that a statement was involuntary.  *See United States v. Turner*, 157 F.3d 522, 555 (8th Cir.

1998).  Indeed, both police coercion and susceptibility of the defendant must be present for a defendant's statements to be deemed involuntary.  *E.g.*, *Colorado v. Connelly*, 479 U.S. 157 (1986) (found defendant's confession to be voluntary despite his severe mental illness because there was no evidence of police coercion or overreaching); *United States v. Makes Room for Them*, 49 F.3d 410 (8th Cir. 1995) (found defendant's confession to be voluntary where defendant had a diminished capacity to resist pressure but there was no police coercion); *United States v. LeBrun*, 363 F.3d 715, 715 (8th Cir. 2004) (en banc) (found defendant's confession to be voluntary where, although there was ample evidence of police overreaching, defendant did not have a particularly susceptible nature or sensibility); *United States v. Astello*, 241 F.3d 965 (8th Cir. 2001) (same); *United States v. Klynsma*, 2009 WL 3147790, *31 (D. S.D. Sept. 29, 2009) ("There must be police coercion or overreaching to the extent that [defendant]'s will was overborne, and [defendant] must show signs of susceptibility to having his will overborne.  When faced with a factual scenario where only one factor was present, the Eighth Circuit and Supreme Court have consistently held that a defendant's statements were voluntary.").

Here, while Defendant stated he had Asperger syndrome and that his mother served as his guardian, he also informed SA Booth that he had graduated high school.  He answered her questions in a logical manner.  He declined the option to call his guardian. Nothing in the record suggests he was intoxicated.  He was repeatedly informed of his right to terminate the interview.  But more importantly, a review of the recording of the interview makes clear that SA Booth used no coercive tactics during her interview with Defendant.

9

She was respectful, kind, honest, and straightforward with him.  She made no threats or promises.  Because there was no police coercion, the statement cannot be deemed involuntary, and Defendant's motion should be denied.

## B.  NOTICE OF INTENT TO CALL WITNESSES.

Pursuant to Local Rule 12.1(c)(3)(A), the Government intends to call Special Agent Katie Booth at the motions hearing in relation to Defendant's motion to suppress statements.  The Government estimates that the duration of Special Agent Booth's direct examination will be approximately 20 to 30 minutes.

Dated:  March 19, 2020

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

*/s/ Manda M. Sertich*

BY:  MANDA M. SERTICH
Assistant U.S. Attorney
Attorney Id No. 4289039